UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JERMAINE D. CARPENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 14-3047 |
| | ) | |
| GREGG SCOTT, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Plaintiff, proceeding pro se and presently civilly committed at Rushville Treatment and Detention Center, brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging failure to protect from harm and retaliation.  The matter comes before this Court for ruling on the Defendants' Motion for Summary Judgment.  (Doc. 186).  The motion is granted.

## PRELIMINARY MATTERS

### Plaintiff's Motions Regarding Witness Affidavits

### (Docs. 229, 232, 235, 242)

Plaintiff filed a Motion (Doc. 229) seeking dismissal of Defendants' motion for summary judgment on the basis that he was

unable to obtain affidavits from his witnesses. The witnesses, according to Plaintiff, can provide attestations consistent with his testimony regarding statements made to Defendant Lay immediately prior to the January 2014 attack described in the facts below. Plaintiff states he has been unable to obtain affidavits because the witnesses have either been released from the facility or fear retaliation from TDF staff.

Plaintiff later filed a Motion to Supplement his response to Defendants' motion for summary judgment (Doc. 242) to include an affidavit from one of the witnesses (Terry Johnson). The statements made in the affidavit are consistent with the testimony Plaintiff anticipates from the other witnesses from whom he was unable to obtain an affidavit. As discussed below, the Court takes statements made in the affidavit as true for purposes of ruling on Defendants' motion for summary judgment. The failure to provide affidavits from all the witnesses does not adversely affect Plaintiff at this stage of the proceedings.

Accordingly, Plaintiff's Motion to Supplement (Doc. 242) is granted and the Court discusses this evidence below. Plaintiff's Motion to Dismiss (Doc. 229) is denied. Plaintiff's Motions for Order

(Docs. 232, 235) seeking an order directing TDF staff to provide notary services to Terry Johnson is denied as moot with the filing of Mr. Johnson's affidavit.

## Motions Related to Video Evidence (Docs. 216, 231, 240)

Plaintiff filed several motions seeking sanctions for the destruction of video evidence in this case. (Docs. 216, 231, 240). As noted in the Court's previous orders, two videos of the January 2014 attack were preserved and presented to the Court. The parties do not dispute that other potentially relevant video footage once existed, but that it was not retained in this case.

Plaintiff made several requests for preservation of videos of the incident through the TDF grievance process. See (Doc. 216 at 11); (Doc. 216-1 at 2, 6). Defendants, in their response, provided an affidavit from Chris Clayton, the Security Director at Rushville, stating that Rushville has limited electronic storage to retain all videos and that "[t]here were other views from a variety of locations in the facility from January 13, 2014 which were not retained because the footage from other locations did not show any of the incident between residents Carpenter and [Resident C] occurring." (Doc. 221-1 at 3, ¶ 8). Clayton also states that "[b]ased on my

review of the footage maintained in this case as well as my knowledge of the surveillance of the TDF, video from [the locations Plaintiff now requests] would not have included the altercation between [the two residents]." Id. ¶ 9.

Sanctions for spoliation of evidence are appropriate only where the evidence was destroyed for purposes of hiding adverse information. See Trask-Morton v. Motel 6 Oper. L.P., 534 F.3d 672, 681 (7th Cir. 2008); see also Mathis v. John Morden Buick, Inc., 136 F.3d 1153, 1155 (7th Cir. 1998) (That the documents were destroyed intentionally no one can doubt, but bad faith means destruction for the purpose of hiding adverse information.). Furthermore, courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent. Trask-Morton, 534 F.3d at 681.

Defendants provided an affidavit stating that they do not have the resources to retain all video at the facility, and, upon review of the footage, Defendants argue that the January 2014 attack was not recorded on videos other than the two already produced. In addition, Plaintiff has not shown what adverse evidence would have

been obtained on the videos in question. The parties do not dispute that Defendant Lay handcuffed Plaintiff and escorted him down the hallway. The only disputed facts are those related to the conversation between Plaintiff and Defendant Lay when Defendant Lay went to retrieve Plaintiff. Neither party argues that the video would have recorded the audio of that interaction, and the videos provided to the Court do not have sound. Therefore, the Court finds that Plaintiff has not made the requisite showing to warrant sanctions for the spoliation of evidence. Plaintiff's motions (Docs. 216, 231, 240) are denied.

**Plaintiff's Motion to Reopen Discovery (Doc. 243)**

Plaintiff filed a Motion to Reopen Discovery. (Doc. 243). Plaintiff requests that discovery be reopened to allow him to ascertain exactly how many TDF residents heard Resident C threaten to harm Plaintiff. A district court has considerable discretion in determining whether or not to reopen discovery. Flint v. City of Belvidere, 791 F.3d 764, 768 (7th Cir. 2015) (noting that discovery must have an endpoint and "district courts are entitled to—indeed they must—enforce deadlines.").

As discussed below, the Court assumes that Resident C made the threat for purposes of ruling on the Defendants' motion for summary judgment. Even assuming the threat was made, Plaintiff cannot prevail as a matter of law. The number of residents that may have heard Resident C make this threat does not change the result. Plaintiff's motion is denied.

## Other Motions

Defendants' Motion for Extension of Time to Reply to Plaintiff's Response (Doc. 233) is granted. Defendants have since filed the appropriate document within the time period requested. No new deadlines are necessary.

Plaintiff's Motions to Clarify (Docs. 223, 230, 238) are granted insofar as they request the Court note that Plaintiff does not intend to file a dispositive motion, to confirm that Defendants Erghott and Wear have been dismissed, and to clarify a heading in his response to Defendants' motion for summary judgment.

Plaintiff's Motion for a Special Pretrial Conference (Doc. 241) to determine whether a potential witness has been harassed by TDF staff is denied. This issue is not relevant to Plaintiff's claims.

Plaintiff's Motion (Doc. 247) is denied.  Plaintiff filed what appears to be a copy of a TDF policy without an accompanying motion.  The Court is unclear as to what relief Plaintiff seeks.

Defendants' Motion for a Telephone Status Conference (Doc. 220) is denied as moot.  The Court has already ruled upon the motions for which Defendants sought a hearing.

Plaintiff's Motion for a Copy (Doc. 226) is denied.  If Plaintiff desires a copy of any document, he must pay the copying fee of 10 cents per page ($0.10/page) up front.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor.  Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010).  The party moving for summary judgment must show the lack of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

## FACTS

Plaintiff is civilly committed at Rushville Treatment and Detention Facility ("Rushville" or "TDF") pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 Ill. Comp. Stat. § 207/1 *et seq.* The Court previously granted summary judgment in favor of Defendants Jumper, Caraway, Lodge, Louck, and Reid ("Liberty Healthcare defendants") in its Opinion entered August 23, 2016, and Defendant Scott was dismissed in the Court's Merit Review Opinion. <u>See</u> (Docs. 7, 125). Defendants Erghott and Wear were later dismissed on Plaintiff's motion. (Doc. 222). The remaining Defendants are employed in the following capacities: Defendant Kunkel was the Director of Security; Defendant Winters was a Security Specialist; Defendant Hankins was the Public Service Administrator; and Defendants Lay, Clark, and Mayes were Security Therapy Aides ("STA").

Animosity between Plaintiff and another TDF resident ("Resident C") developed in December 2013 when they resided in the same housing pod.  According to Plaintiff, the relationship between them became increasingly contentious because "every time I walk by he is calling me all type[s] of bitches and hoes and, you know, talking about me being in group [therapy]."  Pl.'s Dep. 17:18-20.  Resident C would also sweep Plaintiff's feet with a broom without saying "excuse me" and would yell while Plaintiff was on the phone with friends and family.  (Doc. 228-4 at 3-4, ¶ 9).  On December 15, 2013, Resident C bumped into Plaintiff, did not say "excuse me," and a fight ensued.  Id. at 3, ¶ 7.

Security staff observed Plaintiff holding Resident C on the ground with his arms wrapped around Resident C.  Security staff also observed Plaintiff punching and biting Resident C.  This was the first time he and Resident C had gotten into a physical altercation.  UMF 74, 75.  Plaintiff, however, admitted in his deposition that this was not the first time he had been the aggressor in a physical altercation with other residents.  Pl.'s Dep. 33:20-23 ("And I got into a fight with a guy named Resident G, and in the midst of that fight I bit him.  I beat him up way worse than

the fight that me and Resident C had.").  The two residents were placed on temporary special management status, a more restrictive status typically reserved for those accused of violating facility rules, after the fight.  UMF 60.  TDF staff also placed them in different housing pods.

According to Plaintiff, Resident C continued to antagonize him after the December 2013 fight despite the fact that they were housed in different pods in the Special Management/Fox units. Plaintiff states in his affidavit that on December 16, 2013, Resident C "announced 'I beat that bitch mothafucker [sic] Carpenter's ass y'all," while Resident C was retrieving hygiene materials from his former room.  (Doc. 228-4 at 4, ¶ 15).

On December 24, 2013, another incident occurred.  According to the incident reports, "[Plaintiff] began shouting at [Resident C] who was on another pod."  (Doc. 76-2 at 7).  Defendant Wear heard Plaintiff yell, "next time don't go to the police," while Defendant Erghott characterized Plaintiff's shouts as threats.  Id.; (Doc. 187-10 at 3).  Plaintiff ignored commands to stop and he was taken back to his room for a two-hour cooldown.  In the process, Plaintiff called Defendant Erghott a "bitch" and accused him of retaliation.

Plaintiff does not dispute that he had a security escort each time he left his housing pod.

Plaintiff later told the Behavioral Committee on January 3, 2014, that "every time I walk by, [Resident C] curses me out. I tell him to shut up and stop trying to alert STAs." (Doc. 228-8 at 2). Plaintiff summarized the situation as a "verbal back and forth." Id. In his affidavit, Plaintiff states that Resident C called him names, cursed him, and made threats during the relevant time period but Plaintiff does not identify what those threats were. (Doc. 228-4 at 7, ¶ 24) ("[Resident C] began to curse me and make threats stating that I was a bitch and couldn't fight because I had to bite him, all I said to [Resident C] in response was to leave me alone and stop fronting in front of the police."); id. ¶ 25 ("[Resident C] began to laugh through the door and make fun of me being sent back to the wing.").

Resident C attacked Plaintiff on January 13, 2014. At the time, Defendant Lay was escorting Plaintiff through the Special Management/Fox unit foyer. Plaintiff was in handcuffs, while Resident C was unrestrained and in the foyer to complete his assigned work task. Videos provided to the Court show that

Defendant Lay was escorting Plaintiff through the foyer when Resident C attacked Plaintiff.  The video shows Resident C on top of Plaintiff attempting to strike him.  Security staff separated the two inmates and Plaintiff received prompt medical attention.

Terry Johnson, one of Plaintiff's witnesses, stated in an affidavit that shortly before the incident occurred, Defendant Lay told Resident C to complete his work task, and Resident C yelled out to Defendant Lay that if he "brought that punk ass bitch Carpenter out here, [Resident C would] beat [Plaintiff's] ass."  (Doc. 242-1 at 3).  The affidavit also states that Plaintiff informed Defendant Lay of his safety concerns, and, had Defendant Lay ordered Resident C to stop attacking Plaintiff, Resident C "would have done what Lay told him…immediately as he always does."  Id. at 4.

Defendant Lay states in his affidavit that he did not observe Resident C in the foyer when Plaintiff mentioned him.  (Doc. 187-5 at 2).  Defendant Lay admitted in his response to interrogatories that he was aware of the prior fight between Plaintiff and Resident C at that time.  (Doc. 228-19 at 2).  Once the attack happened, Defendant Lay states he immediately radioed for help and that he

did not attempt to break up the two residents because he did not feel it was safe to do so alone.  (Doc. 187-5 at 2, ¶ 13).

The parties agree that Defendants Clark, Winters, Kunkel, and Mayes were not present during the altercations between Plaintiff and Resident C, nor were they involved with Plaintiff's specific housing assignments or escorts during the relevant time frame. UMF 69.

## ANALYSIS

## Failure to Protect

Plaintiff was a civil detainee and his rights are derived from the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's proscription against cruel and unusual punishment.  Burton v. Downey, 805 F.3d 776, 784 (7th Cir. 2015) (citing Pittman v. Cnty. of Madison, 746 F.3d 766, 775 (7th Cir. 2014)).  The standards under the respective amendments are essentially the same.  Id. (citing Smego v. Mitchell, 723 F.3d 752, 756 (7th Cir. 2013)).

To succeed on a failure to protect claim, a plaintiff must show (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and, (2) officials acted with "deliberate

indifference" to that risk. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). For purposes of satisfying the first prong, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a [detainee] faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." <u>Id.</u> at 843. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to [detainee] health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u>

Plaintiff was the aggressor in the December 2013 fight, and he admitted in his deposition to a history of altercations with other inmates where he acted as the aggressor. Though Plaintiff states in his affidavit that Resident C threatened him, Plaintiff does not describe any specific threats he received from Resident C, and his statements to the Behavioral Committee describe the situation as a "verbal back and forth." Plaintiff was also disciplined for his involvement in the December 24, 2013 incident where STAs described his comments as threats towards Resident C. In

addition, Plaintiff submitted several grievances to TDF staff during the relevant time period. One of the grievances, filed on December 25, 2013, mentions Resident C by name, but the grievance does not state that Plaintiff feared an attack. Instead, Plaintiff complains that Resident C was permitted additional privileges. (Doc. 228-10 at 9).

The threat Resident C allegedly made towards Plaintiff shortly before the January 2014 attack, however, could support a finding that Plaintiff faced a substantial threat of physical harm. Defendants argue in a response to Plaintiff's motion for sanctions that the Court should not consider Johnson's affidavit because the video evidence contradicts his statements. (Doc. 245 at 2-3, ¶ 10). Defendants argue that a conversation between Resident C and Defendant Lay was impossible given that Resident C approached Plaintiff and Defendant Lay from the opposite direction immediately prior to the attack.

The question, however, is the route Defendant Lay took to reach the entrance of Plaintiff's housing pod as Johnson's affidavit states the conversation took place prior to Plaintiff leaving his housing pod. If the hallway through which Defendant Lay escorted

Plaintiff was the only way to get to Plaintiff's housing pod, then Defendant Lay would have had to walk past Resident C to retrieve Plaintiff, and a conversation was not impossible. If an alternate route to Plaintiff's housing pod was available, Defendants have not presented any evidence of it. The Court cannot conclusively determine that the statements made in Johnson's affidavit are incredible, and the Court must leave that determination to the trier of fact. Therefore, the Court finds that a triable issue of fact exists as to whether Plaintiff faced a substantial risk of harm.

Nonetheless, Plaintiff's claims cannot proceed. Officials "who actually knew of a substantial risk to [detainee] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; see also Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008) ("[A] prison official does not violate the Eighth Amendment every time an inmate gets attacked by another inmate."). The record discloses that Plaintiff and Resident C were physically separated from each other for the duration of the relevant time period, and Plaintiff does not dispute that he had a security escort

each time he left his housing pod, including on the date of the attack.

Plaintiff argues that Defendant Lay should have ordered Resident C into a housing pod while Plaintiff was escorted through the hallway, but the "mere failure of [an] official to choose the best course of action does not amount to a constitutional violation." Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002). Plaintiff was not permitted to dictate the security measures taken to protect him, and providing Plaintiff with a security escort at the time was not unreasonable given all the circumstances. Plaintiff's own witness stated that Resident C was always compliant with TDF staff's commands. See (Doc. 242-1 at 3) (Resident C "would have done what Lay told him…immediately as he always does.").

In addition, Plaintiff's affidavit and grievances show that Plaintiff's decision to leave the housing pod at that time was voluntary. (Doc. 216 at 11) (The STA "asked if I wanted to do my PPG—I politely responded by saying yes….I allowed STA II Lay to handcuff me and walk me towards the PPG room."); (Doc. 228-4 at 9, ¶ 34) (stating same). If Plaintiff feared an attack, he could have

stayed in his housing pod as no inference arises that TDF officials ordered him to leave.

Moreover, a "guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put [the guard] in significant jeopardy." Guzman v. Sheahan, 495 F.3d 852, 858 (7th Cir. 2007). At the time of the attack, Defendant Lay was the only STA in the immediate area, he was outnumbered two-to-one, and the nearest STAs were behind at least one set of locked doors. In this situation, Defendant Lay was not required to attempt to break up the fight by himself.

Finally, Defendants Clark, Winters, Kunkel, and Mayes could not have known about the alleged threat Resident C made given the short duration of time between the alleged threat and the attack and Plaintiff's concession that they were not present at the time. Plaintiff does not assert a failure-to-protect claim against Defendant Hankins. Pl.'s Dep. 89:4-8. Accordingly, the Court finds that no reasonable juror could find that Defendants violated Plaintiff's Fourteenth Amendment rights.

## Retaliation

To prevail on a retaliation claim, the Plaintiff must show that he engaged in activity protected by the First Amendment; he suffered a deprivation that would likely deter First Amendment activity in the future; and the First Amendment activity motivated the decision to take retaliatory action. Bridges v. Gilbert, 557 F.3d 541, 553 (7th Cir. 2009). If Plaintiff can make a prima facie showing that his protected activity was a "motivating factor" that caused the alleged harm, then the burden shifts to the defendants to show that the harm would have occurred anyway, despite the protected activity. Greene v. Doruff, 660 F.3d 975, 979 (7th Cir. 2011).

The parties do not dispute that Plaintiff has filed numerous lawsuits while confined at Rushville TDF, or that filing a lawsuit is a protected First Amendment activity. In its' previous Opinion, the Court found that Plaintiff did not suffer a deprivation likely to deter future First Amendment activity given the number of grievances and lawsuits he continued to file after this incident.

Furthermore, Plaintiff has not shown that any actions on the part of TDF officials were motivated by Plaintiff's First Amendment

activity. Plaintiff's main complaint is that TDF officials failed to eliminate all contact, potential or otherwise, between him and Resident C. Specifically, Plaintiff states that TDF officials failed to move one of them to a different housing unit. Plaintiff does not identify to which housing unit he or Resident C should have been moved—he argues only that TDF officials could have moved one of them.

TDF residents who violate the facility's rules are housed in the Special Management/Fox unit, where they have fewer privileges than the residents residing in other housing units. Plaintiff and Resident C had both been found guilty of violating the rules based upon their involvement in the December fight. Moving either one of them to another housing unit that allows a resident to have more privileges would have effectively negated the consequences for violating the rules. Therefore, the Court finds that Plaintiff has failed to show that any action on the part of TDF officials was motivated by his First Amendment activity.

Accordingly, the Court finds that no reasonable juror could conclude that any Defendant retaliated against Plaintiff for the exercise of his First Amendment rights.

**IT IS THEREFORE ORDERED:**

1) Plaintiff's Motions [223][230][238][242] are GRANTED.

2) Plaintiff's Motions [216][226][229][231][232][235][240][241][243][247] are DENIED.

3) Defendants' Motion for Telephone Status Conference [220] is DENIED.

4) Defendants' Motion for Extension of Time [233] is GRANTED.

5) Defendants' Motion for Summary Judgment [186] is GRANTED. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions not addressed below are denied as moot, and this case is terminated, with the parties to bear their own costs.

6) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. See Fed. R. App. P. 24(a)(1)(c); see also Celske v Edwards, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); Walker v. O'Brien, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose...has some merit" from a legal perspective).

**If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.**

ENTERED:        September 26, 2017.

FOR THE COURT:

_s/ Sue E. Myerscough_
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE